UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

Civil Action No.: 18-8162

PAVEL LABUSOV, an individual, and ALINA LABUSOVA,
an individual,

Plaintiffs,

**VERIFIED COMPLAINT
FOR DAMAGES,
DECLARATORY AND
INJUNCTIVE RELIEF,
AND DEMAND FOR JURY
TRIAL**

-against-

OAKES CAPITAL LLC, a foreign for-profit entity,
JOAN GALY, an individual, ROBERT ASADULLIN,
an individual  and WILLIAM DONALD REDFERN,
an individual,

Defendants.

--------------------------------------------------------------------------x

Plaintiffs, PAVEL LABUSOV and ALINA LABUSOVA, husband and wife (hereinafter referred to as "Labusov"), by and through undersigned counsel, alleges upon information and belief the following against Defendants OAKES CAPITAL LLC (hereinafter referred to as "Oakes"), JOAN GALY (hereinafter referred to as "Galy"), ROBERT ASADULLIN (hereinafter referred to as "Asadullin")  and WILLIAM DONALD REDFERN (hereinafter referred to as "Redfern") (collectively referred to as "Defendants").

## PRELIMINARY STATEMENT

1.  This action arises out of Defendants' egregious and unlawful actions in relation to a Credit Facility Agreement entered into between the parties in 2015.

2.  Defendants have materially breached the terms of the Agreement to Labusov's detriment.

3.  Following the breach Defendants through their agents began to engage in serious threats

1

against Plaintiff and his family.

4.   Time is of the essence in this litigation, and Labusov thus bring claims against Defendants for breaches of contract and fraud.  Labusov additionally seeks declaratory and injunctive relief to enjoin Defendants from taking any other action which would unduly encumber the collateral at the heart of this action.

5.   All conditions precedent to the filing of this action have been performed or waived.

## THE PARTIES

6.   Labusov is *sui juris* before this Court, an individual over the age of 18, a resident of Florida, and at all times material, was the co-owner of Apaville LLC, a Florida-based limited liability company.

7.   Oakes is a for-profit New York-based corporate entity which represents itself as a lending institution in the State of New York.  Upon information and belief, Oakes maintains its principal office in New York, at 445 Park Avenue, 9th Floor, New York, NY 10022 and is licensed to conduct ordinary business in this District.

8.   Galy is *sui juris* before this Court, an individual over the age of 18 and at all times material, was the Manager of Oakes, acting as its Agent.

9.   Asadullin is *sui juris* before this Court, an individual over the age of 18 and at all times material, was the Managerand Partner of Oakes in Russia, acting as its Agent.

10. Redfern is *sui juris* before this Court, an individual over the age of 18 and at all times material, was the soliciting party who, under the care and control of Oakes, solicits investors to invest in the Oakes Capital Fund.  Redfern conducts ordinary business in Russia on behalf of Oakes.  Redfern represents to potential investors in Russia, particularly Moscow, that the Oakes

Fund lends money for commercial transactions and that Oakes is a large lending institution in New York.

## JURISDICTION AND VENUE

11. Jurisdiction is proper in this District as this case involves violations of Federal Law and thus involves federal questions and violations against a foreign citizen.

12. This Court has jurisdiction under 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

13. Pursuant to 28 U.S.C. § 1332(a), "[a] case falls within the federal district court's original diversity jurisdiction only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 388, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (internal quotation marks and citation omitted).

14. Additionally, Rule 4(k)(2), Federal Rules of Civil Procedure, provides federal courts with personal jurisdiction over a foreign defendant "in federal question cases and if the foreign defendant has sufficient contacts with the United States to satisfy due process requirements." See *Eskofot A/S vs. EI Du Pont De Nemours & Company*, 872 F. Supp. 81 - Dist. Court, SD New York 1995.

15. Defendants are subject to this Court's personal jurisdiction under N.Y. C.P.L.R. §302(a) which provides that: "…a court may exercise personal jurisdiction over any non-domiciliary who, either "in person or through an agent": (i) "transacts any business within the state or contracts anywhere to supply goods or services in the state"; (ii) "commits a tortious act within the state"; (iii) "commits a tortious act without the state causing injury to person or property within the state

... if he [a] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or [b] expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce"; or (iv) "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. §302(a)(1)-(4).

16. Defendants represent that Oakes is a lending institution with offices in New York.

17. Defendants transacted business in the State of New York.

18. Defendants have contracted for services in the State of New York.

19.  Defendants have solicited business and derived significant revenues from interstate and/or international commerce generated in the State of New York.

20. "[C]ourts have explained that section 302 is a `single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir.2010) (internal quotation marks omitted); see also *Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc.*, 923 F.Supp. 433, 436 (S.D.N.Y.1996) ("Personal jurisdiction pursuant to section 302(a)(1) may be satisfied with proof that just one transaction occurred in New York as long as defendants' activities were purposeful and substantially related to plaintiffs' claim.").

21. Oakes, through its agents, Redfern and Galy, is subject to this Court's jurisdiction under Section 302(a).

22. This Court may exercise personal jurisdiction over Oakes because it "transact[ed] business" in New York "through an agent." N.Y. C.P.L.R. § 302(a)(1). Foreign defendants can be subject to

personal jurisdiction where another party "engaged in purposeful activities in the state ... with the consent and knowledge of the defendants, who both benefitted from those activities and exercised extensive control over [the party] in the transaction underlying th[e] suit." *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir.1988); see also *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).

23. This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

24. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events giving rise to this claim occurred in this District. Most notably, Oakes operates its United States business out of this District.

25. Venue is proper in this District as Oakes maintains its principal place of business in this District and upon information and belief, the Agreement at the heart of this action was prepared in this District.

26. Jurisdiction and venue are thus proper.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

*The Credit Facility Agreement.*

27. At the heart of this action is the Defendants' willful breach of the Credit Facility Agreement entered into between the parties in December of 2015 (hereinafter referred to as the "Agreement"). *A true and correct copy of the Credit Facility Agreement is attached hereto as "Exhibit A."*

28. The Agreement was fully executed by the parties, specifically between Labusov, co-owner Alina Labusova, and Defendant Galy, as Manager for Oakes and Manager for Fletcher Capital Management LLC (collectively referred to herein as the "parties").

29. The Agreement is a legally binding contract between the parties.

30. The Agreement sets forth the terms and conditions under which the parties must operate.

31. The Agreement's terms and conditions are not ambiguous and were clearly defined and explained to all parties prior to execution.

32. At the time of execution, Labusov and his wife had a mortgage free rental portfolio in the State of Florida.

33. Labusov's portfolio included the following collateral as promulgated under the Agreement:

    (1) Apaville LLC

    (2) Deerk LLC

    (3) Meadowland Estate LLC

    (4) Pruni LLC

    (5) Towntrade LLC

34. All of the collateral are Florida based limited liability companies organized under the laws of the State of Florida.

35. In December 2015, Labusov agreed to leverage his properties and obtain a line of credit from Oakes. The purpose of the line of credit was to purchase income producing properties in the United States.

36. Redfern suggested the line of credit when it became apparent that a joint venture or joint partnership with Labusov was not an option. Labusov agreed that no partnership should arise out of the working relationship. Accordingly, no partnership was ever formed between the parties.

37. The Agreement generally provides Labusov and his LLC, namely Apaville, LLC with a $1.5 million-dollar line of credit to borrow against his collateralized real estate portfolio.

38. The line of credit provided by Oakes collateralized Labusov's $1.5 million-dollar portfolio

and provided a line of credit worth $1.5 million dollars at an interest rate of $3.75%.

39. Labusov paid all fees as stipulated in the Agreement.

40. Mr. Labusov never received any money as a result of the loan, the funds which were borrowed but were never credited to Apaville, LLC, which at the time of the initial loan disbursement was under the control of the Defendants.

41. In 2016, Defendants formed Bridgetown, LLC for purchase of a single family house and then transferred $35,000.00 from the credit line to Apaville, LLC, which at that time already de facto belonged to the Defendants, who took it as collateral, following the receipt of the initial capital, Labusov began work on the first real estate project, title to which was also taken by the Defendants. Oakes took title to all of the properties in Labusov's real estate portfolio and refinanced the first purchase taking out $205,000.00.

42. Labusov made all required monthly payments pursuant to the terms and conditions of the Agreement.

43. Subsequently, Labusov decided to purchase another property and decided to do renovation work on it, upon receiving permission, Defendants created yet another LLC funded it and permitted Labusov to begin development by taking out a construction loan from Oakes. The loan was within the framework of the Agreement.

44. Defendants, and the companies which they controlled, took out loans from TD Bank and Legacy Bank leveraging Labusov's assets, the loans which Defendants took were done without Labusov's consent.

45. The proceeds of said construction loan and other loans referenced above went directly to Defendants.

46. Defendants never used their own money for the loans they gave to Labusov, rather Redfern

borrowed funds from commercial banks and relent the money to Labusov, however, copies of said mortgage agreements and statements form the issuing banks were never provided to Labusov, moreover, Labusov's consent for the loans was never obtained.

47. Labusov was never in default of the terms and conditions of the Agreement.  Specifically, Labusov always maintained a current account status with Defendants and even on occasion prepaid the loans.

*Labusov's Relationship with Redfern.*

48. Labusov met Redfern in early 2015 through mutual friends, Asadullin in Moscow.

49. Asadullin, a former high ranking Russian government official, had indicated that him and Redfern are equal partners in Defendants' business as it pertains to all clients from Russia, including Plaintiff.

50. Asadullin represented that he is a former agent of the Russian Security forces and that he manages Defendants' Moscow Office for which he receives fifty percent of all proceeds, he also made sure that the "business ran smoothly".

51. When the relationship between the parties began to deteriorate, he offered to solve the issues if Labusov pay him 15,000 Euro, when his offer was rejected he began to make threats against Labusov and his family.

52. The threats of violence and arrest of Plaintiff's family members began to escalate when negotiations between Plaintiff and Redfern came to a standstill, and Asadullin closed the Moscow office removing all files and computer all while using his associates to make threats against the Plaintiff.

53. The purpose of Asadullin's threats was for Plaintiff not to file the instant action and to just "forget about the deal".

54. When Plaintiff initially started communicating with Redfern after the introduction from Asadullin, there was no communication between Plaintiff and Asadullin until on or about May of 2018, all communications were made directly between Labusov and Redfern with Asadullin resuming direct contact with Plaintiff only after Plaintiff demanded termination of the agreement between Plaintiff and Defendant.

55. Since Labusov was initially happy with the loans offered by Redfern, Labusov introduced Redfern to several potential clients who were interested in working with and hiring Redfern. Among these introduced parties were David Kislin, Igor Generalov, Michael Rolnik, and Peter Sharapov.

56. Labusov never received any compensation or commission from Redfern for making these referrals.

57. Over a substantial period of time during their working relationship, Labusov was almost always in communication with Mr. Simon Kizhner, who is a Russian-speaking manager for Oakes, living in New York.

58. Mr. Kizhner could never give an answer to Labusov's questions without consulting with Redfern.

59. Interestingly, Labusov never got to meet Ms. Joan Galy, another agent for Oakes. Any and all documents which needed to be signed were signed by her through Simon Kizhner.

60. Labusov never met Simon Kizhner, but spoke almost exclusively with him on the phone.

61. Mr. Kizhner stopped answering Labusov's phone calls about two weeks before the official letter of termination was sent to Defendants.

62. In March of 2018, Redfern stopped responding to phone calls. Subsequently, Labusov made attempts to reach other Defendants, but those attempts were also fruitless. Therefore, Labusov

decided not to borrow any money anymore from him or his companies and thus aggressively paid down the loan via partial liquidation of assets.

*Termination of Agreement.*

63. On or about May 9, 2018, Labusov decided to exercise his option under the Agreement to close off his loans, cancel the Agreement and regain ownership of his properties.

64. Due notice of Labusov's intent to terminate the agreement was sent to Defendants. See *"Exhibit B."*

65. Thus far, Defendants have not responded favorably to the cancellation request and through his attorney, Redfern has refused to return the properties to Labusov.

66. The Agreement provides:

"Should the Client, being in compliance with the terms and conditions of this Agreement, have repaid all outstanding principal and interest due under it, and request in writing the Closing of the Credit Facility and return of the Collateral, the Fund shall, within 60 days of receiving the Client's written request, transfer to the Client 100% of the shares of the Holding Company and cancel all charges the Fund may have on the Collateral."

67. At all times material, Labusov was in full compliance with the terms and conditions of the Agreement.

68. At all times material, Labusov made his required monthly payments on time, the payment, statements, and all repayment documentation were prepared by the Defendants without the involvement of the Plaintiffs.

69. At all times material, Labusov properly requested in writing the Closing of the Credit Facility and return of the Collateral. As of the last statement issued by the Defendants, which was June of 2018, the present balance required to close the balances is actually a positive balance

(overpayment) of $21,691.71, See *"Exhibit C"*, the second loan taken for development of a single-family home has a balance of $586,388.85, See *"Exhibit D"*, no other loans are outstanding.

70. Labusov wants to terminate the loans and repay the balances, subsequently acting in accordance with the terms of the only agreement which the parties entered into, upon the payment of the payoff amount all properties shall be reverted to Labusov.

71. Defendants have failed and have refused to return the collateral.

72. Defendants have failed to transfer 100% of the shares of the Holding Company, Apaville back to Labusov.

73. Moreover, Defendants have heavily encumbered the assets with mortgages even though Labusov paid back almost everything he borrowed.

74. Upon information and belief, Defendants have no money to pay off the mortgages and return the properties to Labusov.

75. Defendants' wrongful conduct herein is the cause of Labusov's damages.

## COUNT I: DECLARATORY AND INJUNCTIVE RELIEF

76. Labusov reasserts and incorporates by reference the allegations in all preceding paragraphs above.

77. A claim for declaratory relief under the Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202) requires a controversy that can be decided by the court, i.e., the presence of a claim of a substantive right that will trigger the court's adjudicative function. See S. *Jackson & Son. Inc. v. Coffee. Sugar & Cocoa Exchange. Inc.*, 24 F.3d 427, 431 (2d Cir. 1994) ("[A] mere demand for declaratory relief does not by itself establish a case or controversy necessary to confer subject matter jurisdiction.").

78. The legality of Defendants' actions and conduct demonstrate a controversy to be decided in a Court of law.

79. Defendants' conduct is ongoing and continuing as the collateral is subject to numerous outstanding encumbrances.

80. Unless enjoined by this Court, additional damage may be done to the collateral, including further encumbrances.

81. Under the Second Circuit's traditional standard, a district court is entitled to grant a preliminary injunction where a plaintiff demonstrated (i) "irreparable harm," and (ii) either (a) "a likelihood of success on the merits" or (b) "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Otoe-Missouria Tribe of Indians v. N.Y. Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir.2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir.2009)).

82. Unless enjoined by this Court, Defendants will continue to hold title to the collateral, thus enabling them to further perpetuate their wrongdoings.

**WHEREFORE**, Labusov requests that this Honorable Court enter an order:

    (1) Enjoining Defendants from performing any direct or indirect action on the collateral which would subject them to encumbrance;

    (2) Declaring the Agreement cancelled as of the date final payment under the Agreement is made and funds have cleared;

    (3) Declaring that all collateral be immediately transferred back to Labusov; and

    (4) Awarding Labusov any other relief deemed just and proper.


## COUNT II: BREACH OF CONTRACT

83. Labusov reasserts and incorporates by reference the allegations in all preceding paragraphs above.

84. "To state a claim for breach of contract [under New York law], a plaintiff must allege `(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" *Picini v. Chase Home Fin. L.L.C.*, 854 F.Supp.2d 266, 273 (E.D.N.Y. 2012) (quoting *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994)).

85. The Agreement is a legally binding contract between the parties.

86. Labusov performed as directed under the Agreement's terms and conditions.

87. Defendants have breached the terms of the Agreement by not Closing the Credit Facility and returning the collateral to Labusov.

88. Defendants have heavily encumbered the collateral.

89. Labusov provided the requisite 60-day notice of his request to close the credit facility and regain the collateral.  Defendants have failed and/or refused to do so.

90. The parties had an affirmative duty to perform as directed under the Agreement.

91. Defendants breached their duty by not performing as required under the Agreement.

92. As a result of Defendants' breach, Labusov has been financially damaged.

**WHEREFORE**, Labusov requests that this Honorable Court enter judgment against Defendants:

(1) for their willful breach of contract;

(2) in an amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Labusov any other relief deemed just and proper.

## COUNT III: FRAUD

93. Labusov reasserts and incorporates by reference the allegations in all preceding paragraphs above.

94. "In order to sustain an action for actual fraud the plaintiff must prove: (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury (24 N.Y.Jur., Fraud and Deceit, s 14; 37 C.J.S. Fraud s 3)." *Brown v. Lockwood*, 76 AD2d 721, 730 [2d Dept 1980].

95. Defendants represented that the terms and conditions of the Agreement would be performed.  Specifically, Defendants represented that upon repayment of all outstanding principal and interest due, the Credit Facility would be closed and all collateral would be returned to Labusov.

96. Defendants knew at the time of making such representation that they had no intention of complying with this provision.

97. Defendants induced Labusov in collateralizing his assets, at no point until the beginning of 2018 did Plaintiffs know that Defendants collateralized their assets by borrowing money from commercial banks .

98. Labusov justifiably relied upon the representations and misrepresentations made by Defendants.

99. "In order to recover damages for fraud, a plaintiff is required to prove, by clear and

convincing evidence, a misrepresentation, which was false and known by the defendant to be false, made for the purpose of inducing the plaintiff to rely upon it, justifiable reliance and injury (see *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 [1996]; *Gizzi v. Hall*, 300 A.D.2d 879, 880, 754 N.Y.S.2d 373 [2002]; *McGovern v. Best Bldg. & Remodeling*, 245 A.D.2d 925, 926, 666 N.Y.S.2d 854 [1997] ). As to the element of reliance, "[w]here a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he [or she] cannot claim justifiable reliance on [the] defendant's misrepresentations" (*Stuart Silver Assoc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 98–99, 665 N.Y.S.2d 415 [1997]; see *Cohen v. Colistra*, 233 A.D.2d 542, 542–543, 649 N.Y.S.2d 540 [1996]; *Pinney v. Beckwith*, 202 A.D.2d 767, 768, 608 N.Y.S.2d 738 [1994] )." *Tanzman v. La Pietra*, 8 AD3d 706, 707 [3d Dept 2004].

100.    As a result of Defendants' wrongful conduct and fraudulent misrepresentation, Labusov has been financially damaged.

> **WHEREFORE,** Labusov respectfully requests that this Honorable Court enter judgment
>
> against Defendants:
>
> (1) for their willful fraudulent conduct;
>
> (2) in an amount of damages to be determined at trial;
>
> (3) attorneys' fees and costs incurred in bringing this suit;
>
> (4) pre- and post- judgment interest; and
>
> (5) awarding Labusov any other relief deemed just and proper.

## COUNT IV: VIOLATION OF GENERAL BUSINESS LAW §349

101.    Labusov reasserts and incorporates by reference the allegations in all preceding

paragraphs above.

102.      New York law proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state." GBL § 349(a). To state a claim, a plaintiff must allege (1) that the defendant's acts were consumer oriented, (2) that the acts or practices are "deceptive or misleading in a material way," and (3) that the plaintiff has been injured as a result. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995); *accord Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir.2009); *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 883 N.Y.S.2d 772, 911 N.E.2d 834 (2009); *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002).

103.      Defendants conduct everyday commerce in the State of New York.

104.      Oakes represents itself as a large lending institution in order to entice investors into investing their money in the Fund.

105.      Oakes markets its services to consumers in New York and in Russia.

106.      Defendants' representations that they act in compliance with contractual agreements was false and misleading.  Defendants had no intention of honoring the Credit Facility Agreement entered into with Labusov.

107.      In a typical "bait-and-switch" practice, Defendants acquired control of the collateral with no intention of ever returning said assets upon fulfillment of the terms of the Agreement.

108.      As a direct result of Defendants' willful violations, Labusov has been damaged.

**WHEREFORE**, Labusov requests that this Honorable Court enter judgment against Defendants:

(1) for their willful violation of New York's General Business Law;

16

(2) in an amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Labusov any other relief deemed just and proper.

## COUNT V: FRAUDULENT REPRESENTATION

109.     Labusov reasserts and incorporates by reference the allegations in all preceding paragraphs above.

110.     In numerous conversations during the material timeframe herein, Redfern represented to Labusov that he was an agent of Oakes.

111.     In numerous conversations during the material timeframe herein, Redfern represented to Labusov that Oakes was a financial lending institution with over one billion in assets.

112.     At all material times, Redfern knew that he was not licensed to perform lending institution duties.

113.     Labusov justifiably relied upon Redfern's representations when entering into the Agreement.

114.      In numerous conversations during the material timeframe herein, Redfern and Galy represented to Labusov that his Collateral would be held safe during the performance of the Agreement.  This did not happen.  Defendants intentionally encumbered the Collateral by, without authorization, encumbering the properties heavily with mortgages and equity lines of credit.

115.     Though not specifically mentioned in the Agreement, Labusov justifiably relied upon Redfern and Galy's representations that the Collateral would be held encumbrance-free

during the performance of the Agreement.

116.    Defendants knew, or should have known, that the representations given to Labusov were false.

117.    As a result of Defendants' false representations, Labusov has been financially damaged.

WHEREFORE, Labusov requests that this Honorable Court enter judgment

against Defendants:

(1) for their false representations;

(2) in an amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Labusov any other relief deemed just and proper.


## COUNT VI: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT OF 1970 ("RICO") - (18 U.S.C.A. §§ 1961 *et seq.*)

118.    Labusov reasserts and incorporates by reference the allegations in all preceding paragraphs above.

119.    To state a claim under 18 U.S.C.A. §§1961 *et seq.*, a plaintiff must allege (1) that the defendant received money from a pattern of racketeering activity, (2) invested that money in an enterprise, (3) the enterprise affected interstate commerce, and (4) an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves. See *Johnson v. GEICO Casualty Co.,* 516 F. Supp. 2d 351 (D. Del. 2007).

120.    Defendants have engaged in a "pattern of racketeering activity" as defined under

18 U.S.C. § 1962(c).

121.     18 U.S.C. §1962(c) states: *It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.*

122.     Defendants have engaged in at least two related acts of racketeering activity that amount to or have posed a threat of continued criminal activity.  See 18 U.S.C. § 1341.

123.     18 U.S.C. §1341 states in relevant part: *Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.*

124.     Defendants' acts consist of (1) a scheme or artifice to defraud; (2) use of the mail communications in furtherance of the scheme; and (3) intent to deprive Labusov of money, liberty or property.

125.     "A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010).

126.     Upon information and belief, Defendants and its agents, associates, and/or representatives communicated with one another in furtherance of their scheme to defraud via mail, e-mail and telephonic communications.

127.     Oakes maintains offices in New York and Russia.  Defendants solicit business from potential investors in both locations.  Communications between Oakes and its agents are conducted between the two locations and amongst its agents, including Galy and Redfern, via mail, e-mail and telephonic means.

128.     As the Collateral property which is at the heart of the Agreement and this action is located in Florida, communications between Defendants and their agents also were conducted via mail, e-mail and telephonic means to/from that jurisdiction.

129.     By asserting false representations, Defendants induced Labusov into leveraging his Collateral under the guise of compliance with the Agreement.

130.     Defendants intentionally deprived Labusov of the Collateral.

131.     Defendants intentionally and maliciously encumbered the Collateral without any authorization from Labusov.  The Collateral is now heavily encumbered and Defendants have no intention of resolving said encumbrances.

132.     Defendants utilized all funds received from the encumbered Collateral for their own financial and material benefit.

133.     When Plaintiff attempted to regain control of his properties he and his family began to receive threats of violence and false criminal charges in Russia, the threats were made by the

Defendants and their associates.

134.    As a direct result of Defendants' wrongful conduct and purposeful actions under RICO, Labusov has been financially damaged.

WHEREFORE, Labusov respectfully requests that this Honorable Court enter an order:

(1) Finding that Defendants are in violation of The Racketeer Influenced and Corrupt Organizations Act of 1970;

(2) Finding that Defendants have engaged in a pattern of racketeering activity in furtherance of a scheme to defraud Labusov;

(3) Of Judgment against Defendants in the amount of damages to be determined at trial; and

(4) Awarding Labusov any other relief deemed just and proper.

## COUNT VII: VIOLATION OF 18 U.S.C. §1960 – UNLAWFUL OPERATION OF AN UNLICENSED MONEY TRANSMISSION BUSINESS

135.    Labusov reasserts and incorporates by reference the allegations in all preceding paragraphs above.

136.    18 U.S.C. §1960 makes it unlawful for anyone to "knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business."

137.    Redfern represented that he acted as an agent for Oakes, a purported lending institution.

138.    Redfern, as an agent for Oakes, is required to be licensed in the state in which Oakes operates and conducts everyday business.

139.    Redfern is not licensed anywhere.

140.     Upon information and belief, Oakes is an unlicensed Money Transmission Business within the meaning of Section 1960 as it is being operated by and represented as a lending institution without an appropriate money transmitting license in the State of New York.  18 U.S.C. §1960(b)(1)(A).

141.     Defendants have falsely represented Oakes' corporate entity status.

142.     As a result of Defendants' willful violation of Section 1960, Labusov has been financially damaged.

WHEREFORE, Labusov respectfully requests that this Honorable Court enter an order:

(1) Finding that Defendants are in violation of Section 1960;

(2) Of Judgment against Defendants in the amount of damages to be determined at trial; and

(3) Awarding Labusov any other relief deemed just and proper.


## COUNT VIII:  UNLAWFUL CONVERSION

143.     Labusov reasserts and incorporates by reference the allegations in all preceding paragraphs above.

144.     Defendants have, through the use of threats made by agents in Russia and other fraudulent and corrupt practices, forced the conversion of Labusov's assets and interests over to themselves.  Specifically, Defendants have taken title to the Collateral and then releveraged the Collateral to Labusov's detriment.

145.     Defendants have engaged in the before mentioned acts for their own financial benefit.

146.     " Conversion is any unauthorized exercise of dominion or control over property by

one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.   When the original possession is lawful, conversion does not occur until the defendant refuses to return property after demand or until he sooner disposes of the property" See *Moses vs. Martin*, 360 F. Supp. 2d 533 - Dist. Court, SD New York 2005.

147.     "To maintain a claim for conversion, a plaintiff must show: (1) the property subject to conversion is `a specific identifiable thing;' (2) plaintiff had `ownership, possession or control' over the property before its conversion; and (3) defendant `exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.   However, an action for conversion cannot be validly maintained "where damages are merely being sought for breach of contract. Rather, a plaintiff must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights."   See *Calcutti vs. SBU, Inc.,* 223 F.Supp.2d 517, 523 (S.D.N.Y.2002).

148.     Defendants have unlawfully converted the Collateral- specifically several Florida-based real estate properties– an identifiable thing.

149.     It is undisputed that Labusov lawfully owned the Collateral.

150.     Defendants coerced Labusov into transferring the Collateral to them with no intention of ever returning the Collateral back to Labusov encumbrance-free.

151.     Defendants' acts were unlawful and wrongful and were not the result of any legally binding contractual claims.

152.     Labusov has been economically damaged as a result.

**WHEREFORE,** Labusov requests that this Honorable Court enter an order:

(1) Declaring that the Collateral has been unlawfully converted to the Defendants;

23

(2) Declaring that Defendants utilized unlawful and wrongful acts in converting the property to themselves solely for their own financial benefit;

(3) Awarding Labusov damages in an amount to be determined at trial; and

(4) Awarding Labusov any other such relief as is deemed just and proper.

## DEMAND FOR JURY TRIAL

Labusov hereby demands a jury trial on all triable issues herein.

Dated: 5-29-2018.

Respectfully submitted,

Daniel D. Estrin, Esq.
Sirota & Associates, P.C.
128 Brighton 11th Street, Suite 2
Brooklyn, NY 11235
Tel: 718-265-5900
danestrin@lawyer.com